# FBI Authority to Charge User Fees for Record Check Services

The Federal Bureau of Investigation has authority to charge the Department of State user fees for FBI record check services used by the State Department to determine whether visa applicants have criminal records and are thus ineligible for visas.

The imposition of user fees by the FBI for record check services is discretionary.

February 11, 1991

MEMORANDUM OPINION FOR THE ASSISTANT DIRECTOR
FEDERAL BUREAU OF INVESTIGATION

This memorandum responds to your request for our opinion whether the Appropriations Act for the Departments of Commerce, Justice, and State, the Judiciary and Related Agencies for Fiscal Year 1990 ("the FY 1990 CJS Act") authorizes the Federal Bureau of Investigation ("FBI") to charge the Department of State user fees for FBI fingerprint identification and name check services ("record check services") provided to the State Department in connection with its review of visa applications. We conclude that the Act authorizes the FBI to establish and collect fees for record check services that are requested for, among other things, "non-criminal justice" purposes. Because the State Department's requests for such visa-related record checks are for a "non-criminal justice" purpose, the FBI may charge the State Department a user fee for record check services provided in response to such requests. We also conclude that the imposition of user fees by the FBI for record check services is discretionary.

I.

The FY 1990 CJS Act authorized the FBI to "establish and collect fees to process fingerprint identification records and name checks for non-criminal justice, non-law enforcement employment and licensing purposes." Pub. L. No. 101-162, 103 Stat. 988, 998-99 (1989) (the "user fee provision"). Based upon this authority, the FBI notified all federal agencies that use record check services that it would charge user fees for all such services that are not specifically for criminal justice or law enforcement purposes. Letter to All Federal Users of FBI Identification Division Services, from Assistant Director in Charge, Identification Division, FBI, at 1 (Dec. 8, 1989). The State Department subsequently asked the FBI to confirm that user fees would

18

not be charged for any visa-related record check services, asserting that "[t]he purpose of such namechecks is to avoid issuance of visas to persons who are excludable from the United States by law; they are, therefore, inextricably intertwined with the enforcement and administration of the criminal and immigration laws of the United States." Letter to William S. Sessions, Director, FBI, from Elizabeth M. Tamposi, Assistant Secretary for Consular Affairs, State Department, at 1 (Feb. 2, 1990).

In responding to the State Department's request, the FBI distinguished between two types of record checks of interest to the State Department. *See* Letter to Elizabeth M. Tamposi, from William S. Sessions (Mar. 26, 1990). The FBI explained that record checks ordered by the FBI's Intelligence or Criminal Investigative Divisions based upon requests submitted by the State Department are considered to be "primary source information in support of the [i]ntelligence and [c]ounterterrorism missions of the FBI's national security responsibilities," and consequently no user fee would be charged for such requests. *Id.* at 2-3. However, the FBI stated that other record checks requested by the State Department in connection with visa applications would be subject to a user fee because they are not "used in support of the FBI's intelligence and counterterrorism, or even criminal investigative mission responsibilities." *Id.* at 3.

The FBI and the State Department attempted to resolve their differences over the FBI's authority to charge user fees for visa-related record checks. That attempt was unsuccessful, and the FBI subsequently requested the opinion of this Office on the scope of the FBI's authority to charge user fees under the FY 1990 CJS Act.

## II.

The FY 1990 CJS Act, as noted above, authorizes the FBI to establish and collect user fees for record check services provided "for non-criminal justice, non-law enforcement employment and licensing purposes." 103 Stat. at 998-99. The State Department asserts that this language, by its terms, authorizes fees only for services provided for "employment and licensing purposes." *See* Letter to Joseph R. Davis, Assistant Director, Legal Counsel, FBI, from Alan Kreczko, Deputy Legal Adviser, Department of State, at 2 (May 24, 1990) ("Kreczko Letter"). Under this reading, the terms "non-criminal justice" and "non-law enforcement" are construed as coordinate adjectives that together modify the word "employment."[1] The FBI, by contrast, argues that the user fee provision must be read as a series of three adjectives, each of

---

[1] Alternatively, these two terms might be considered as modifying the entire phrase "employment and licensing purposes," so that the provision would be read as covering both non-criminal justice, non-law enforcement employment purposes and non-criminal justice, non-law enforcement licensing purposes. The State Department has not taken a clear position as to whether, under its reading of the provision, these two terms modify both "employment" and "licensing" or just "employment." In any event, it is clear that the State Department's use of FBI record check services is not for an employment or a licensing purpose.

19

which modifies the word "purposes." Thus read, the user fee provision authorizes the FBI to impose fees for record check services provided for any of three purposes: a "non-criminal justice" purpose, a "non-law enforcement employment" purpose, or a "licensing" purpose. *See* Letter to Alan Kreczko, from Joseph R. Davis, at 2 (May 2, 1990) ("Davis Letter").

Applying ordinary rules of English grammar, syntax and usage, we conclude that the phrase "non-criminal justice, non-law enforcement employment and licensing purposes" is susceptible of either of two permissible constructions. On the one hand, it would be consistent with ordinary usage to read the terms "non-criminal justice" and "non-law enforcement" as coordinate adjectives that both modify the word "employment." The use of a comma rather than the word "and" between these two terms does not defeat this construction; it is well established that coordinate adjectives may properly be separated by commas. *See, e.g., The Chicago Manual of Style* § 5.45, at 142 (13th ed. 1982) (giving as an example "a faithful, sincere friend"); Government Printing Office ("GPO"), *Style Manual* § 8.38, at 121 (1984) ("short, swift streams").

On the other hand, it would also be consistent with ordinary usage to construe the user fee provision as comprising a series of three terms ("non-criminal justice," "non-law enforcement employment" and "licensing"), each of which modifies the word "purposes." The absence of a comma after the word "employment" does not imply that the provision may not be read as a list of three items. Although grammarians appear to be divided on the strict propriety of omitting the comma before the word "and" in a list of three or more items, *see, e.g., The Chicago Manual of Style* § 5.50, at 143 (final comma should always be used); GPO, *Style Manual* § 8.43, at 122 (same); *see generally* R. Copperud, American Usage and Style 78-79 (1980) ("Opinion is divided on whether the comma should be used before 'and' in a series . . . ."), it is nonetheless consistent with ordinary English usage to leave out the final, or "serial," comma. *See, e.g.,* L. Todd & I. Hancock, *International English Usage* 389 (1987) (comma is used "with words or phrases in a series but not before 'and'"); *see also The World Almanac Guide to Good Word Usage* 52 (M. Manser & J. McQuain eds. 1989) ("the final comma preceding 'and' or 'or' is optional"). At any rate, whatever the views of grammarians, it is clear that Congress regards it as acceptable to leave out the serial comma. In the very same section that enacts the user fee provision, Congress omitted the final comma in a context where it clearly intended that the enumerated activities comprise a series of four activities. *See* 103 Stat. at 998 (appropriating funds to the FBI for expenses for "acquisition, lease, maintenance and operation of aircraft").[2] Accordingly, the FBI's construction of the user fee provision is consistent both with ordinary English usage and, more importantly, with congressional usage.

---

[2] Indeed, Congress does not appear to follow consistently any particular rule with respect to the use of the serial comma. In another list of items in the same section, Congress did use a serial comma. 103 Stat. at 998 (appropriating funds necessary for "detection, investigation, and prosecution of crimes").

The State Department argues that the FBI's construction of the user fee provision renders part of the provision superfluous and that therefore the State Department's construction is syntactically preferable. Kreczko Letter, at 2. We disagree. While "non-criminal justice" purposes, "non-law enforcement employment" purposes and "licensing" purposes are overlapping categories, none of them is completely subsumed within the other two. For example, there are "licensing" purposes that are related to criminal justice and thus *not* within the "non-criminal justice" category (*e.g.*, a firearms license for a court bailiff). Similarly, there are "non-law enforcement employment" purposes that are related to criminal justice (*e.g.*, hiring of a public defender). Accordingly, we cannot conclude that the FBI's construction renders any portion of the user fee provision superfluous.[3]

Because both the construction suggested by the State Department and the one offered by the FBI are grammatically permissible readings of the statutory language, the user fee provision is ambiguous. The legislative history, however, establishes that the FBI's construction is the only one that fulfills Congress' intent in enacting the provision.

The legislative history establishes that the user fee provision in the FY 1990 CJS Act was intended to effect a significant expansion in the authority of the FBI to charge user fees for record check services. Prior appropriations acts had provided the FBI only limited authority to institute a user fee program. Since 1982, appropriations acts for the Department of Justice included language authorizing the FBI to charge fees only for fingerprint identification record checks requested for "noncriminal employment and licensing purposes." Pub. L. No. 97- 257, 96 Stat. 818, 823 (1982); *see also, e.g.*, Pub. L. No. 100- 459, 102 Stat. 2186, 2195 (1988) (appropriations act for fiscal year 1989). By its terms, this statutory language permitted the FBI to charge user fees only for fingerprint identification record checks and then only if requested for "employment" purposes or "licensing" purposes.

In the FY 1990 CJS Act, Congress deleted this earlier, narrow formulation of the FBI's user fee authority in favor of the current language. The report submitted by the Senate Appropriations Committee, which added the new language, explained that the change was intended to expand significantly the FBI's authority to charge user fees for record check services:

> The expanded authority would permit the FBI to institute a user fee for processing of *all requests for other than law enforcement purposes*, including those for other Federal

---

[3] At any rate, the FBI's reading is no more redundant than that suggested by the State Department. Because the terms "non- criminal justice" and "non-law enforcement" substantially overlap, construing *both* words as simultaneously modifying the term "employment" renders the second adjective largely redundant.

Government agencies. The costs to the FBI of providing name check and fingerprint identification services for nonlaw enforcement purposes are considerable and have begun to negatively impact on its basic law enforcement mission. The Committee recognizes the value of these services to other Federal users, however, and believes it is important that the FBI continue to make them available, although on a reimbursable basis.

S. Rep. No. 144, 101st Cong., 1st Sess. 46 (1989) (emphasis added). The Senate Committee thus recognized that the increasing cost of record check services "for nonlaw enforcement purposes" was having an adverse effect on the FBI's overall budget and, consequently, on its ability to perform "its basic law enforcement mission." It therefore expanded the FBI's authority so as to permit the collection of user fees for all record check requests "for other than law enforcement purposes," rather than just the employment and licensing purposes previously authorized. *Id.*

The FBI's construction of the user fee provision is the only reading that gives effect to this unmistakable congressional intent to expand the FBI's authority to charge user fees for all record check services "for other than law enforcement purposes." Under the FBI's reading of the provision, the FBI is authorized to charge a user fee for any record check that is requested for, among other things, a "non-criminal justice" purpose. Because there is a substantial overlap between the term "non-law enforcement," which is used in the Senate Report, and the statutory term "non-criminal justice," the FBI's construction substantially effectuates the congressional intent that the FBI have the authority to collect user fees for record checks performed for all "non-law enforcement" purposes.

By contrast, the State Department's construction fails to expand the range of purposes for which a record check request would be subject to the FBI's user fee authority. Under the State Department's reading, Congress simply substituted a new set of adjectives to describe the type of *employment* purposes for which the FBI could charge a user fee: the coordinate adjectives "non-criminal justice, non-law enforcement" were substituted for the earlier adjective "noncriminal." The State Department has not pointed to any evidence in the legislative history — and we have been unable to find any evidence — that Congress intended to limit the FBI's expanded user fee authority to employment and licensing purposes. On the contrary, this reading of the provision fails to carry out Congress' explicit intent to expand the FBI's authority so that it would cover "all requests for other than law enforcement purposes." S. Rep. No. 144, *supra*, at 46. Indeed, the State Department's reading may actually *contract* the FBI's authority in this regard. To the extent that the two new adjectives do not completely overlap in meaning, the set of employment purposes that are *both* "non-criminal justice" and "non-law enforcement" is necessarily smaller than the comparatively

22

broad set of "noncriminal" employment purposes.[4]

The State Department argues that the FBI's conclusion that it may charge a user fee for record checks conducted for "non-criminal justice" purposes is, on its face, inconsistent with the Senate Report's statement that the provision "would permit the FBI to institute a user fee for processing of all requests for other than *law enforcement* purposes." S. Rep. No. 144, *supra*, at 46 (emphasis added); Kreczko Letter, at 3. In essence, the State Department contends that the FBI's reading places primary emphasis on the wrong statutory term. We find this argument unpersuasive. Under *any* reading of the user fee provision, the term "non-law enforcement" modifies the word "employment"; therefore, there is no sense in which the statutory language can be read to align *precisely* with the description in the Senate Report. Under these circumstances, our task is to determine which of the facially permissible constructions of the statutory text best fulfills the congressional purpose. As explained above, "non-criminal justice" is sufficiently close in meaning to "non-law enforcement" that the FBI's reading effectuates Congress' intent. Indeed, the FBI's reading is the *only* construction that fulfills that intent.[5]

Accordingly, we conclude that the FY 1990 CJS Act must be construed to authorize the FBI to impose a user fee for any record check services performed for a "non-criminal justice" purpose, a "non-law enforcement employment" purpose or a "licensing" purpose.

### III.

The State Department asserts that the record check requests it submits to the FBI "have no other purpose than to support a law enforcement objective" and that they are therefore not subject to a user fee. Kreczko Letter, at

---

[4] Both the State Department and the FBI assert that their respective constructions are supported by the statement in the Senate Report that the new user fee provision was intended to give the FBI authority to charge fees for record checks performed for "all civil, nonlaw enforcement employment and licensing purposes." S. Rep. No. 144, *supra*, at 45 *See* Kreczko Letter, at 3; Davis Letter, at 3. Although we believe that this language helps to clarify the meaning of the term "non- criminal justice," *see infra* p. 24, we do not believe that it assists in determining which of the two constructions is the correct one, because the passage includes precisely the same grammatical ambiguity as the statutory language

[5] Although the State Department's reading fails to give effect to Congress' intent that FBI have the authority to charge a user fee for all record checks conducted for non-law enforcement purposes, S. Rep. No. 144, *supra*, at 46, both constructions of the provision would expand the FBI's user fee authority in three other respects intended by Congress. First, the Senate Report makes clear that, in making these changes to the user fee provision, Congress intended that the provision would be given its full literal scope and therefore that the FBI was authorized to collect user fees from other federal agencies. *Id.* at 45-46. Despite the broad terms of the 1982 provision, the FBI had not collected user fees from federal agencies between 1982 and 1989 Second, the new language also authorized the FBI to charge user fees in connection with "name checks" of criminal records in addition to "fingerprint identification" record checks. *Compare* Pub. L. No. 101-162, 103 Stat. at 999 *with* Pub. L No. 97-257, 96 Stat. at 823. Third, the new provision also allowed the FBI to charge a user fee for record checks performed "for certain employees of private sector contractors with classified Government contracts." Pub. L. No 101-162. 103 Stat at 999. Either reading of the provision would effectuate the congressional purpose on these three points. but only the FBI's construction fulfills Congress' intent that the FBI have the authority to collect user fees *for all record checks conducted for non-law enforcement purposes.*

23

2. It says that its only purpose in submitting name checks in connection with visa applications is "to avoid issuance of visas to persons who are excludable from the United States by law." *Id.* Because "[s]ections 212(a)(9), (10), and (23) of the [Immigration and Nationality Act ("INA")] forbid the issuance of visas to aliens who have criminal records," the State Department argues, its record check requests are submitted for the purpose of enforcing the law and therefore should not be subject to a user fee. *Id.*; *see also* Letter for Paul P. Colborn, Senior Counsel, Office of Legal Counsel, from Alan Kreczko, at 1 (Aug. 31, 1990) ("the sole and exclusive justification for the namecheck/ fingerprint function in the first instance is a criminal justice, law enforcement one, *i.e.*, the detection and exclusion of criminal aliens from the United States in accordance with Congress' intent in the relevant exclusionary provisions of the [INA]").

We conclude, however, that the State Department's requests for record checks in connection with visa applications are for a "non-criminal justice" purpose. In ordinary usage, the term "criminal justice" refers to the administration and enforcement of the criminal law. *See, e.g., Webster's Third New International Dictionary* 1228 (1986) (defining "justice" as the "administration of law"). Accordingly, a "non-criminal justice" purpose is a purpose that is not related to the administration of criminal laws. The Senate Report confirms this understanding of "non-criminal justice" purposes by generally equating them with "civil" purposes. *See* note 4 *supra.* The State Department's requests for visa-related record checks relate not to the administration of criminal laws, but to the administration of certain civil provisions of the INA. The State Department does not request record checks for visa applicants for the purpose of investigating whether those applicants have violated the criminal laws of the United States and should be arrested or prosecuted, but rather to determine whether a visa applicant already has a criminal record that would require his or her exclusion from the United States. *See* 8 U.S.C. § 1182(a)(9), (10), (23) (listing classes of aliens with criminal records who "shall be ineligible to receive visas and shall be excluded from admission into the United States"). Indeed, a decision by the State Department to deny a visa does not involve any criminal penalty. *See id.* § 1201. In short, the State Department's role under the INA does not include criminal justice responsibilities, but rather the administration of a civil program.[6]

---

[6] The State Department also argues that, even if these record checks are not requested for "criminal justice" purposes, they are nonetheless for "law enforcement" purposes and for this reason should be exempt from user fees. It is not clear from the statutory text whether the term "law enforcement" is meant to embrace just the enforcement of *criminal* laws — which we believe to be the more conventional use of the term — or whether it is also intended to include the enforcement of civil laws. As noted above, however, the Senate Report is clear that this term is being used in the narrower sense of criminal law enforcement. *See* S. Rep. No. 144, *supra*, at 45 (user fees generally authorized for record checks requested for "civil" purposes). The State Department's argument ultimately fails in any event because the term "non-law enforcement," as used in the user fee provision, modifies the word "employment." There is, of course, no suggestion that the State Department's review of visa applications is in any way associated with potential employment of aliens by agencies that conduct law enforcement, whether it be civil or criminal.

The State Department's purpose in requesting a record check of a visa applicant is, therefore, a civil, rather than a criminal justice, purpose.[7] Because the record check services that the FBI provides the State Department in connection with visa applications serve a "non-criminal justice" purpose, we conclude that the FBI is authorized to charge user fees for such services.[8]

## IV.

The FBI has also asked whether, if it has such authority, it is *required* to charge the State Department for these services. This question is resolved by the language of the user fee provision, which states that "the Director of the [FBI] *may* establish and collect fees to process fingerprint identification records and name checks for non-criminal justice, non-law enforcement employment and licensing purposes." 103 Stat. at 998-99 (emphasis added). In using the permissive "may," rather than the mandatory "shall," Congress clearly authorized, but did not require, the FBI to charge user fees.[9]

## CONCLUSION

We conclude for the reasons stated that the FY 1990 CJS Act authorizes the Federal Bureau of Investigation to charge the Department of State user fees for FBI record check services used by the State Department to determine whether visa applicants have criminal records and are thus ineligible for visas. We also conclude that the FBI's exercise of this authority is discretionary.

J. MICHAEL LUTTIG
*Assistant Attorney General*
*Office of Legal Counsel*

---

[7] We agree with both the FBI and the State Department that record checks ordered by the FBI's Intelligence or Criminal Investigative Divisions, based upon requests submitted by the State Department, are conducted for a criminal justice purpose and thus are not subject to a user fee.

[8] In light of this conclusion, we do not address the FBI's argument that the Economy Act, 31 U.S.C. § 1535, is available as a separate and independent source of authority. Nor do we consider the FBI's authority to charge user fees to any other particular federal agency, because to do so would require examination of the particular purposes for which the services would be provided. We note, however, that the analytical framework used in this opinion will generally be applicable in the context of record check services provided by the FBI to other federal agencies. We also note that the conclusions and analysis in this opinion remain applicable for the current fiscal year because the user fee provision in the FY 1990 CJS Act has been reenacted verbatim in the fiscal year 1991 appropriations legislation for the FBI *See* Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1991, Pub. L. No. 101-515, 104 Stat. 2101, 2112 (1990).

[9] The provision of record check services to the State Department for visa-related purposes does not implicate the rule prohibiting augmentations of agency appropriations that are not authorized by law. *See generally* United States General Accounting Office, Office of General Counsel, *Principles of Federal Appropriations Law*, at 5-62 through 5-93 (1982). In granting the FBI discretionary authority to impose user fees, Congress has expressly authorized any resulting augmentation in the appropriations of either the FBI or any agency to which it provides record check services.